[Civ. No. 15003. Second Dist., Div. Three. Mar. 29, 1946.]

BEATRICE WHITE et al., Appellants, v. THE LOS AN-
GELES RAILWAY CORPORATION, Respondent.

Katz, Gallagher & Margolis for Appellants.

Gibson, Dunn & Crutcher and Sherman Welpton, Jr., for Respondent.

DESMOND, P. J.—Plaintiffs, widow and mother, respectively of Truman Homer White, deceased, appeal from a judgment of nonsuit rendered by the court when they concluded presentation of their case before a jury in an action for damages based upon his wrongful death. Mr. White was instantly killed when struck by a streetcar owned by defendant corporation and operated by one of its employees. Defendant's motion for nonsuit was based upon the following grounds: (1) that there had been no evidence proving or tending to prove any act of negligence upon the part of the defendant; (2) that if any such evidence had been introduced, the negligence had not been shown to be the proximate cause of the injuries sustained by the deceased; (3) that it conclusively appeared from the evidence adduced on behalf of plaintiffs that the deceased was guilty of contributory negligence as a matter of law. A minute order indicates that section 581, subdivision 5, Code of Civil Procedure, furnished

the ground upon which the motion was granted, namely, plaintiffs' failure to prove a sufficient case.

The accident occurred on New Year's Day, January 1, 1943, about 6:30 p. m., at the intersection of 98th Street and La Brea Avenue, in the city of Inglewood, California. It was dark at that time and the weather was clear and dry. La Brea Avenue, extending in a northerly-southerly direction, is divided by defendant's private right-of-way, which is elevated slightly above the pavement of La Brea Avenue and is bounded on the east and west sides by a curbing flush with the right-of-way and running along the corresponding edges of the La Brea pavement, except where that highway is intersected by cross streets. 98th Street intersects La Brea Avenue at right angles and is paved where it crosses the streetcar tracks. There is a slight down grade of a mile or two in a southerly direction from the point where "La Brea comes into Market . . . until you hit approximately Lennox." Poles are stationed between the streetcar tracks at regular intervals of about 100 feet along the right-of-way. The neighborhood at this intersection is partially business and partially residential. Nothing at the intersection obstructs the view of the right-of-way by an operator of a streetcar or a pedestrian using the crosswalk at 98th Street. There is no illumination other than a light "on the pole right in the middle of the car tracks . . . just a few feet south of the south line of 98th Street." There is no streetcar stop at 98th Street, but there is one on Hardy Street, one block north, a distance of approximately 550 feet. The record indicates that at the time of the accident the deceased was a soldier stationed at Inglewood, California, 30 years of age, in good health, wearing glasses and in full possession of his faculties. He and two soldier companions for the evening were returning to their barracks when he was struck in the pedestrian crosswalk by defendant's southbound streetcar.

The only testimony pertaining to the manner in which the accident occurred was supplied by Clifton R. Ogle, one of decedent's companions, whose deposition was read at the trial, and the police officer who investigated the accident.

Ogle testified that he, Private Van Horn and deceased had just left the "Blue Moon," a bar in Inglewood; that deceased did not have anything to drink there; "We just stepped in there. It was early and no one was there. We walked in and took a look around and went out again. We weren't there

over 15 minutes"; that they then walked up the street two blocks to 98th Street; that just as they turned and stepped over the curb of the sidewalk to cross the street the deceased "got behind us a couple of steps . . . he was talking and all of a sudden he was behind us, that's all I know. All I know is he got killed and he got killed at the intersection." This witness further stated that "when the street car hit him naturally we looked around right quick and White wasn't there. The car carried him approximately . . . fifty or sixty yards down the track before it threw him off the side." Ogle stated further that he did not hear the streetcar, know it was coming or hear any "bell, whistle or any noise whatsoever." This witness was asked, "When was it that you and the other gentleman stepped ahead of Mr. White?" and answered, "we went over the curb to cross the tracks; some way we stepped ahead of him where the street car was. He might have been two steps behind us. . . . we were off the tracks. We had just made the last step over the edge of the track." He further testified that the tracks at the point just referred to were not raised above the level of the ground but "were cemented around."

Harold C. Witty, a police officer of the city of Inglewood for almost sixteen years, testified that he arrived at the scene of the accident "about 6:30 p. m." and proceeded to make an investigation; that he saw White's body lying "alongside of the highway approximately 210 feet north of where the streetcar was stopped." Over the objection of defendant this witness was permitted to testify that Magoon, the motorman, pointed out the spot in the intersection where the streetcar hit the deceased, which was "approximately two feet north on the paved portion of the intersection where you walk across"; also, that Magoon stated that after he had made the stop at Harvey Street and proceeded southerly approximately 200 feet [a distance of "300 to 350 feet north" of the intersection of 98th Street] he saw three or four soldiers crossing the street; that he "thought all of them *was* clear, and he came on down, and when he happened to see this Mr. White, he hit the emergency brake and all . . . and hit him and carried him 150 feet down, where the body went off of the cow catcher, and he continued on 210 feet . . . from where he left the body"; that Magoon told him "he had rung his bell at the intersection" and applied the brakes "just when he hit the

intersection," which the witness estimated to be 50 feet from the point of impact as indicated by Magoon. Witty further testified that the streetcar headlight was on at the time of his arrival; that he did not question Magoon as to whether the headlight was on at the time he came down the right-of-way into the intersection of 98th Street; that he and Officer Burgess, in the presence of Magoon, made the measurements from the point of impact to the spot where the body lay, and then to the point where the streetcar finally came to rest. It was on this state of the record that the nonsuit was granted.

 Respondent argues that the statements made by motorman Magoon to Officer Witty were hearsay and "not *res gestae* or spontaneous declarations, being a mere narration of events in explaining an accident," and were, therefore, inadmissible as to the defendant. While some of the statements of the officer may have fallen within the category of hearsay testimony, we do not feel that the essential details as to how, when and under what condition the accident occurred, as related by Magoon to Witty, should have been withheld from the jury. Under the principles set forth in *Showalter* v. *Western Pacific R. R. Co.* (1940), 16 Cal.2d 460 [106 P.2d 895]; which case is deemed to have overruled *Shaver* v. *United Parcel Service* (1928), 90 Cal.App. 764 [266 P. 606]; *Froeming* v. *Stockton Electric R. R. Co.* (1915), 171 Cal. 401 [153 P. 712, Ann.Cas. 1918B 408], and *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.* (1909), 156 Cal. 379 [104 P. 986], cited by respondent in support of its position (see *Lane* v. *Pacific Greyhound Lines* (1945), 26 Cal.2d 575, at p. 582 [160 P.2d 21]), we do not believe the trial court abused its discretion in admitting the statements, Officer Witty having testified that he arrived at the scene "about 6:30," the time the accident was alleged to have occurred. When Magoon made the statements to the officer he had just been through the tragic experience of having struck and killed a man, the body was lying in full view at the side of the tracks, and we believe it may be fairly said that his statements were spontoneous, and made while he was under great excitement and emotionally upset.

In the Showalter case, *supra*, the court said (p. 467): " . . . where a declaration is made under the immediate influence of the occurrence to which it relates and so near the time of that occurrence as to negative any probability of fabrication, said declaration is admissible. . . . The practice in this

state heretofore has been to allow the trial court no discretion in determining the admissibility of alleged *res gestae* statements; however, under the view taken herein there is necessarily some element of discretion in the trial court.

"As stated by the court in *Roach* v. *Great Northern Ry. Co.,* 133 Minn. 257, 260 [158 N.W. 232]: 'In passing upon the admissibility of testimony claimed to constitute a part of the *res gestae,* the trial court determines whether unsworn statements are so accredited that they may go to the jury and be weighed and valued by it, and in determining this it considers whether the statements are spontaneous, whether there was an opportunity of fabrication or a likelihood of it; the lapse of time between the act and the declaration relating to it; the attendant excitement; the mental and physical condition of the declarant, and other circumstances important in determining whether the trustworthiness of the statements is such that they may safely go to the jury.' " (See, also, *Lloyd* v. *Boulevard Express* (1926), 79 Cal.App. 406 [249 P. 837], cited with approval in *Coryell* v. *Clifford F. Reid, Inc.* (1931), 117 Cal.App. 534, 536 [4 P.2d 295], and *Lane* v. *Pacific Greyhound Lines, supra,* 26 Cal.2d 575, 582 [160 P.2d 21], where the court said: "Hence, a spontaneous declaration made by an employee may be admissible against his employer as an exception to the hearsay rule pursuant to the rule under discussion separate and apart from the question of whether it was made in the scope of employment. There may be situations where they are admissible under both theories or under only one or the other.")

Appellants contend that the evidence introduced by them, coupled with the presumption that the deceased exercised due care for his safety, was sufficient to permit the case to go to the jury on the question of defendant's negligence. In disposing of an appeal from a judgment of nonsuit, the appellate court must "view the evidence in the light most favorable to appellant, must disregard all inconsistencies and *draw only those inferences from the evidence which can reasonably be drawn which are favorable to appellant.* [Italics ours.]" (*Kirk* v. *Los Angeles Ry. Corp.,* 26 Cal.2d 833, 837 [161 P.2d 673].) While there was no evidence as to the speed of the streetcar in miles per hour at the time of the accident or immediately before, it appeared from the testimony that Magoon applied his brakes 50 feet north of the point where his car struck deceased and that the car traveled a distance

of 410 feet from that point to the point where it finally came to rest. It may be reasonably inferred, therefore, that the streetcar was going at a high rate of speed at the time it entered the intersection and at the time of the impact. The questions whether that speed was so excessive as to constitute negligence under the particular circumstances here related, and whether the motorman used sufficient care to keep the streetcar under his control immediately prior to the impact, were properly for the jury to decide. (*Bilton* v. *Southern Pacific Co.* (1906), 148 Cal. 443, 447 [83 P. 440]. See, also, *Phillips* v. *Pacific Electric Ry. Co.* (1927), 80 Cal.App. 641, 645 [252 P. 628], where the evidence in that case was held sufficient to warrant an inference that the streetcar was running at an excessive rate of speed and where the court said: "It is certainly negligence to run a street-car through a residence section of a city at such a rate of speed that it cannot be brought to a standstill, under known conditions, within a distance short of 250 feet, and the jury may have reasonably inferred from the evidence that but for such excessive speed the plaintiff would have safely passed the automobile ahead of him.")

In *Shipley* v. *San Diego Elec. Ry. Co.* (1930), 106 Cal.App. 659, 661 [289 P. 662], the court said: "*The rights and duties of those in charge of a street-car are reciprocal with the other users of the public streets.* It is, therefore, the duty of one operating a street-car to exercise ordinary care to avoid a collision with another user of the public street of a city. [Cases cited.] The operator of an electric car upon a city street is charged with the duty of using ordinary care in the management and operation of his car [citing case], and to use ordinary care in maintaining a vigilant lookout for other users of the street. [Citing case.] It is the duty of an operator of a street-car to use ordinary care and *give to others on the street some warning of its approach* [citing case], and to operate street-cars 'in the manner and run them at a speed which is customary at the particular place, and they will give the usual warnings and signals, and take the usual precautions to avoid injury to others.' [Citing case.] . . . Ordinary care requires the operator of a street-car, as well as the driver of a motor vehicle, to be watchful for others in his path." (Italics ours.) Since Ogle testified that the deceased was only "a couple of steps," perhaps "two steps" behind his companions, it might have been inferred by the jury, if given the

opportunity, that the motorman did not maintain the vigilant outlook required of him for other pedestrians using the crosswalk, having been apprised of the fact that pedestrians were "on the tracks." Further, the fact that Ogle testified that he heard no warning or bell, contrary to the motorman's statement that he sounded his bell immediately upon seeing deceased and at the same time applied his brakes, is some evidence that no warning was given by the motorman since Ogle was in a position to have heard a bell if one had been rung. (*Thompson* v. *Los Angeles etc. Ry. Co.* (1913), 165 Cal. 748, 752 [134 P. 709]; *Peri* v. *Los Angeles Junction Ry. Co.* (1943), 22 Cal.2d 111, 118-119 [137 P.2d 441].) Whether there was a failure on the part of Magoon to sound his bell or otherwise warn pedestrians of the approach of the streetcar prior to the discovery of deceased's peril, and whether such failure was culpable, were likewise questions for the determination of the jury.

 Respondent argues that "the only reasonable inference that can be drawn from this testimony is that the deceased in crossing the private right of way of the defendant Company stepped directly into the path of the oncoming street car without either looking in the direction from which danger was to be anticipated or heedless of the danger if he did observe the approaching street car. This action of the deceased made him guilty of contributory negligence as a matter of law." In answering this argument the language of the court in *Wiswell* v. *Shinners* (1940), 47 Cal.App.2d 156, 160 [117 P.2d 677] is apropos: "Where, as in the instant case, death has ensued as a result of the accident, thereby sealing the lips of the injured party, the surviving spouse as plaintiff in the action for the alleged wrongful death, was entitled to invoke the aid of certain presumptions indulged in by law. The presumption is that every person obeys the law; that every person takes ordinary care of his own concerns, and that a person is innocent of crime or wrong. (Code Civ. Proc., sec. 1963, subds. 1, 4, and 33.) There was therefore present in this case the presumption that decedent, while crossing through the intersection, was at all times exercising the requisite degree and amount of care for his own safety *by looking in the direction from which danger could be anticipated.* . . . True, where facts are admitted or established by proof which is irreconcilable with the presumption, the latter loses its evidentiary value. Nevertheless the presumption is a species of indirect

evidence (Code Civ. Proc., sec. 1957), and will prevail in and control the deliberations of the jury unless it is overcome by satisfactory evidence.'' (Italics ours.) On the state of the record in this case we find nothing which is irreconcilable with this presumption. The deceased was in a pedestrian crosswalk, a place where he was lawfully entitled to be and, since his companions had reached a place of safety over the same road, the question of whether he should have observed the immediate proximity of the streetcar, or whether, in making an error in judgment as to the speed or danger of the approaching streetcar, he was guilty of contributory negligence, was also for the consideration of the jury, the test, under these circumstances, being whether deceased's action was compatible with the conduct of a person of ordinary prudence.

From our survey of the testimony and our consideration of the claims of the appellant, we believe the court erred in granting defendant's motion for nonsuit. Judgment is reversed.

Shinn, J., and Wood, J., concurred.