[Civ. No. 7600.   Third Dist.   May 17, 1949.]

RAE CONNORS et al., Appellants, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Miller & Kroloff, McAllister & Johnson and Walter C. Frame for Appellants.

R. B. Daley, Gilbert L. Jones, Dan Lane and Roy A. Weaver for Respondents.

THOMPSON, J.—The plaintiffs, who are the surviving widow and minor children of Charles E. Connors, have appealed from a judgment of nonsuit which was granted at the close of their evidence. Mr. Connors, who was driving

a truck loaded with fruit on the public highway in the night-time, was instantly killed as the result of colliding with a Southern Pacific railway train which was crossing the highway on a spur track near Tracy. The appellants assert that the crossing is hazardous and inadequately lighted and that no adequate warning of the passing of the train was given.

We are convinced the court erred in granting the motion for nonsuit at the close of plaintiffs' evidence. There appears to be sufficient evidence, with the reasonable inferences to be drawn therefrom, of the negligence of the defendants in failing to provide suitable lighting for the crossing or to give adequate warning of the presence of the train to require a denial of the motion for nonsuit, and to entitle the cause to be submitted to the jury. The burden was on the defendants to prove the asserted contributory negligence of the deceased. We think contributory negligence does not appear as a matter of law. The motion should have been denied.

Charles E. Connors was 34 years of age. He was married to the plaintiff Rae Connors in 1930. There are two children, aged 15 and 13 years, respectively, as the issue of their marriage. They lived in Sacramento. He had been employed for about two years by Earl M. Fletcher, an orchardist of the Sacramento Valley, to drive a truck and to haul fruit to the market in that vicinity. He usually hauled fruit to the Libby, McNeill and Libby cannery in Sacramento. He was an industrious and capable truck driver. On the occasion of the accident he was driving a diesel truck and a trailer loaded with peaches from Woodland by way of Sacramento and Stockton to Sunnyvale. The vehicles and load of fruit weighed over 22 tons. The machine was equipped with good headlights, spotlights, Westinghouse air brakes, and 12 gears. Frank Wardlow, another employee of Mr. Fletcher, accompanied him on that trip with another similar truck and trailer. At the time of the accident, which occurred at 2:30 o'clock in the morning, Wardlow followed immediately behind the truck driven by Mr. Connors. They procured their loads of fruit and reached Sacramento at 6 o'clock p. m. on August 19, 1947, where they ate their dinner and then slept for about four hours. They left Sacramento at midnight and arrived at Stockton about an hour later, where each ate a sandwich and drank some coffee. There is no evidence or contention that either of them drank any intoxicating liquor. They traveled about 35 or 40 miles per hour. It took them 30 minutes

to drive from Stockton to the point of the collision, near Tracy, which is 21 miles distant.

At the place where the accident occurred, highway number 50 extends easterly and westerly. About one-half mile east of Tracy the Southern Pacific main line track crosses the highway at a right angle in a northerly and southerly direction. The highway crosses the main railroad track at that point by means of an overpass. Beyond that point, and about a quarter of a mile to the west of the overpass, a spur track, which is seldom used, parallels the main line, passing near or into the Heinz plant. From the apex of the overpass to the spur track the highway grade descends sharply. There is no light in the immediate vicinity of the spur truck crossing. There is one city light on a 20 or 30-foot pole about a quarter of a block to the west of the spur track near the outskirts of the city of Tracy. There is also another light at the entrance to the Heinz plant, which is 300 or 400 feet from that crossing. Several witnesses testified that the spur track crossing was poorly lighted. A traffic officer testified that "visability and lighting" at that point were "very poor." A witness, William Iam, testified "that is the dark spot there at night." John Borges, speaking of the city light to the west of the spur track, said, "I believe there is one, a *dim light.*" Regarding the spur track crossing he said, "Well, it is always dark" there. There is absolutely no evidence that the deceased knew that was a hazardous crossing at night, or even that the spur track existed at the foot of the grade beyond the overpass of the main line track.

We may reasonably infer that when the deceased had traversed the overpass he thought he was beyond the hazard of the railroad crossing, and that he was not aware of the spur track at the foot of the grade. As he approached the overpass he threw the clutch into lower gear to climb the grade. When he passed the apex, he switched the clutch back into higher gear. William Iam, a truck driver for the Dairymaid Creamery, who chanced to be standing near a building about 150 feet from the crossing, testified that he distinctly heard the deceased "as he shifted into gears" at that point. That evidence of hearing the shifting of gears on the down grade, just before the collision occurred, refutes the respondents' theory that Mr. Connors was then asleep. It also furnishes some evidence that the deceased was not aware of the spur track hazard at the foot of the grade. As the deceased descended the grade, his headlights and spotlights were burn-

ing "in perfect condition all the way through." His companion, Mr. Wardlow, testified as follows: "Q. Did Mr. Connors have on his track lights?" to which he replied, "Yes. . . . two spotlights, two headlights." This furnishes some evidence of due care on the part of the deceased.

It appears from the testimony of trainmen, which was taken under section 2055 of the Code of Civil Procedure, that just before Mr. Connors reached the overpass, defendants' train, consisting of 15 low gondola and beet-rack cars, was traveling slowly in a southerly direction on the spur track. The gondola cars were over 40 feet in length. The train was over 500 feet in length. The switch engine was hauling the train toward or past the Heinz plant. The crew consisted of an engineer, fireman, and three trainmen. Robert McArthur was riding on the front footboard of the engine. Each of the trainmen had a lantern. Before crossing the state highway the train stopped at the highway so the trainmen might look for traffic and place fusees on the highway to warn motorists of the passing of the train. McArthur had a lantern and two fusees. We may infer that one fusee was intended to be placed on either side of the passing train. All other trainmen remained in the cab of the engine. McArthur said that he placed one fusee on the northern shoulder of the road west of and about 3 feet from the track. None was placed on the east side of the spur track. He put the other fusee in his pocket, boarded the engine and signaled to the engineer to proceed. The gondola cars were painted either black or dark red. They were difficult to see in the nighttime. The cars were equipped with no lights or reflectors. No trainmen, with or without lanterns, were stationed on or beside the moving cars. They all remained in the cab. It is obvious that while the cars were passing the crossing the burning fusee on the west side of the intervening train would furnish no warning whatever to a motorist approaching on the highway from the east. There was an ordinary, unlighted cross-arm sign near the crossing and white lines with the usual "R. R." letters were painted on the pavement near the spur track, which afforded little warning to a highway motorist traveling in the dark of the night.

The engineer testified that before crossing the highway he blew the whistle and rang the bell. Several witnesses, standing near by, said that they heard no whistle or bell. After the engine had passed the crossing a considerable distance, it is apparent that the headlight would furnish little or no

warning of the presence of the train to motorists approaching on the highway. The train proceeded slowly, at a speed of not more than 5 or 6 miles per hour. We may assume that, for the purpose of this appeal, while Connors was coming down the grade his headlights would undershoot, for some distance, the passing cars. If he could see the highway over the tops of the low gondola cars, and did not observe the cars because of their dark color and the lack of crossing lights, he would be led to believe the highway was open and unobstructed, if indeed he knew the spur track was there.

The engine had passed the crossing some 200 feet or more when the truck crashed into the side of the fifth or sixth gondola car behind the engine. It struck with such force that the gondola car was derailed. The truck was damaged, and Mr. Connors was instantly killed.

We are convinced the foregoing evidence furnishes adequate proof of defendants' negligence to entitle the cause to be submitted to the jury, and that the motion for nonsuit should therefore have been denied. The burden was on the defendants to prove contributory negligence. Certainly the evidence does not show contributory negligence as a matter of law. We are of the opinion the evidence, uncontradicted by further testimony, would support a verdict for plaintiffs, if the cause had been submitted to the jury and a favorable verdict had been returned for them.

The rule with respect to the granting or denial of a motion for nonsuit upon the termination of plaintiff's evidence is well established. The plaintiff is entitled to full credit for all favorable evidence together with the reasonable inferences which may be drawn therefrom. The trial court may not weigh the evidence upon that motion, nor discredit witnesses. If the evidence which has been adduced is conflicting the trial court must accept that testimony which is most favorable to the plaintiff. (*Williamson* v. *Pacific Greyhound Lines,* 78 Cal.App.2d 482, 485 [177 P.2d 977]; *Seaford* v. *Smith,* 86 Cal.App.2d 339, 343 [194 P.2d 792]; *Mastro* v. *Kennedy,* 57 Cal.App.2d 499 [134 P.2d 865]; *Mastrangelo* v. *West Side Union High School Dist.,* 2 Cal.2d 540, 544 [42 P.2d 634]; *Nichols* v. *Southern Pac. Co.,* 58 Cal.App.2d 91, 98 [136 P.2d 332]; *Estate of Rabinowitz,* 58 Cal.App.2d 106 [135 P.2d 579]; 9 Cal.Jur. § 35, p. 551; 5 Cal.Jur. 10-Yr. Supp. (1944 Rev.) § 35, p. 267.)

In railroad crossing cases, the owners and operators of trains are bound to exercise ordinary care in crossing pub-

878

lic highways commensurate with the conditions existing and the hazards to be encountered. (*Peri* v. *Los Angeles Junction Ry.*, 22 Cal.2d 111, 120 [137 P.2d 441]; *Harper* v. *Northwestern Pac. R. R. Co.*, 34 Cal.App.2d 451 [93 P.2d 821]; *Mallett* v. *Southern Pac. Co.*, 20 Cal.App.2d 500 [68 P.2d 281].) ■ When there is substantial evidence of a lack of ordinary care of the railroad company or its trainmen in crossing a public highway, that question should ordinarily be presented to the jury for its determination, and a nonsuit should not be granted. In the Peri case, *supra,* the court said, at page 122:

". . . Likewise, it is only reasonable to say that the necessity, nature, character and extent of the warnings such as flagmen, flares, lights and signals, shifts with the circumstances of the particular case, and is a question of fact in each case. (See *Cooper* v. *Southern Pacific Co.*, 43 Cal.App.2d 693 [11 P.2d 689]; *Alloggi* v. *Southern Pacific Co.*, 37 Cal. App. 72 [173 P. 1117]; *California Rendering Co.* v. *Pacific Elec. Ry. Co.*, 205 Cal. 73 [269 P. 922].)"

In the Mallett case, *supra,* a judgment for plaintiff was affirmed on appeal. In that case the driver of an automobile, who was familiar with the crossing in question consisting of a main track and two parallel side tracks, which were provided with a wigwag signal not then swinging and a light situated on a pole 160 feet from the crossing, ran in the nighttime into a low gravel gondola car attached to an engine and several other cars, which blocked the crossing in the town of Corning. She was seriously injured. It was contended she was guilty of contributory negligence because the presence of the train across the highway was itself a sufficient warning since her headlights should have disclosed the obstructing gondola car. Regarding that subject, this court said at page 505:

". . . [I]t is common knowledge that a black stationary object [the gondola car] against the dark background of a highway is difficult to see on a dark night, even with the aid of standard headlights. Obviously, the color of an object on the highway on a dark night, and the presence of other objects which may deepen the shadows in that vicinity, must be considered in determining how clearly it may be seen by means of standard automobile headlights. For the reason that standard headlights of an automobile do not clearly illuminate the dark surface of a highway, the motor vehicle department paints a white stripe in the center thereof. [Citing an authority.]"

In the Harper case, *supra*, a nonsuit was reversed on appeal. A hearing by the Supreme Court was denied. The facts of that case were somewhat similar in many respects to those of the present suit. In that action the driver of an automobile who was not familiar with the locality, and did not know of the presence of a train across the highway on a spur track, on a dark night ran into a freight car which then blocked the highway in the city of Petaluma. The engine had crossed the highway and its headlight therefore afforded no warning. Several cars were attached to the engine. They were painted a dark red color, and were not easily distinguishable in the darkness. Two brakemen with their lanterns were riding on the ladders attached to the cars. The conductor, with his lantern, stood on the highway on the side opposite that upon which the deceased was approaching. There was one 60 candle power electric lamp on a pole 300 feet from the crossing. A row of trees on Wilson Street helped to render the crossing obscure. There was also an ordinary cross-arm sign at that crossing. There was a conflict of evidence regarding the blowing of a whistle and the ringing of a bell. This court said "We believe it was error to grant a nonsuit under the conditions here existing, and the order and judgment must be reversed."

In spite of the fact that the engineer and a trainman in this case testified that the whistle was blown and the bell rung while the train was crossing the highway, the evidence of other witnesses, who stood near by and were in a position to have heard the whistle and bell if they had been sounded, that they heard no whistle or bell furnishes some evidence of negligence in that respect, entitling that issue to be presented to the jury. (*Peri* v. *Los Angeles Junction Ry.*, *supra*; *Jones* v. *Southern Pacific Co.*, 74 Cal.App. 10, 26 [239 P. 429]; *White* v. *Los Angeles Ry. Corp.*, 73 Cal.App.2d 720, 727 [167 P.2d 530].)

We are of the opinion the plaintiffs were entitled to rely upon the presumption created by section 1963, subdivision 4, of the Code of Civil Procedure, that the deceased took due care of his own safety in operating the truck at the time of the accident, to be weighed by the jury under the circumstances of this case. (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540, 552 [299 P. 529]; *Westberg* v. *Willde*, 14 Cal.2d 360, 365 [94 P.2d 590].) We may not say that the presumption was dispelled by the evidence which was adduced by plaintiffs, as a matter of law. There is evidence in this case that

the deceased was traveling downgrade with a heavy load; that he was in control of his brakes which were in good condition, and that his headlights and spotlights were burning brightly. The inference is that he had no knowledge of the presence of the freight train, or even that there was a spur track at the bottom of the grade. We find no evidence which would dispel the presumption or render him guilty of contributory negligence as a matter of law.

The judgment of nonsuit is reversed.

Adams, P. J., and Peek, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied July 14, 1949. Edmonds, J., Traynor, J., and Schauer, J., voted for a hearing.